IN THE UNITE D STATE S DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

HILDA CURET-VE LÁZ QUEZ, et al.,

    Plaint iffs,

    v.

ACEMLA  DE PUERTO RIC O, INC., et al.,

    Defendants.

Civil N o. 06-1014 (ADC)

OPINION  & OR DER

I.    Procedural Background

    Plaintiffs, Hilda Curet-Velázquez ("Ms. Curet"),  Eduardo Curet-Velázquez, and Hilda Velázquez-Coto (collectively , "plai ntiffs"), fi led this action against defendants, ACEMLA  de Puerto Rico, Inc. ("ACEMLA")  and Latin Am erican Mu sic Co., Inc. ("LAMCO")  (collectively , "defendants")  for violati ons of the Copyr ight Act of 1976, as amended, 17 U.S.C.§ 101, et seq ("Copyr ight Act").  Docket No. 1.  Duri ng the course of the li tigati on of thi s claim, plaintiffs submitted two motions for summary judgment (Docket Nos. 12 & 55), whi ch were referred to  Magistrate-Judge  Bruce  J.  McGiverin  ("Magis trate-Judge")  for  a  Report  and Recommendation ("R & R").  The Magistrate-Judge issued a report whi ch recommended granting in part and denying in part plaintiffs' motions.  On August 26, 2008, the court adopted the R & R in full.  Docket No. 82.

    The court held a bench trial on Mar ch 19, 20, 23, 24, and 25, 2009. At the beginning of tri al, the court reiterated its summary judgment findi ngs as to defendants' copyright infri ngement of the followi ng three compositions: " Pueblo Latino" on, at least, two (2) occasi ons; "Periódico de Ayer" on, at least, one (1) occasi on; and "Planté Bandera" on, at least one (1) occasi on. When questioned as to whether plai nti ffs were going to present any further evidence to prov e more infri ngements of these three compositions or for two other compositions (" A la Yumbaé" and " Distinto y Diferente") alleged in the complaint, plai nti ffs stated they were only tr yi ng the infri ngements of the three compositions di sposed of thro ugh summary judgment.  Docket No. 124, at 3.  Thus, the issues to be resolved are whether

defendants' conduct constitutes a willful infringement or whether the same is a breach of contract so material, adverse and substantial as to cause a rescission of their contractual relationship and what damages should be awarded to plaintiffs.

During the course of trial, the following witnesses testified: Ms. Hilda Curet-Velázquez ("Ms. Curet"); Mr. Richie Viera ("Mr. Viera"; Mr. Felix Norman Román-Negrón ("Mr. Román" or "the expert"), and defendant Mr. Luis Raúl Bernard ("Mr. Bernard"). At the conclusion of trial on March 25, 2009, the court heard each parties' closing arguments. During the course of trial and in its post-trial brief, defendants challenge and move to strike plaintiffs' expert's testimony and report. The court will briefly entertain defendants' challenges as to the expert's qualifications and report.

II.      Expert's Qualifications and Report

Defendants challenged Mr. Román's qualifications to serve as an expert in copyright infringement as well as the methodology he used in his report to determine plaintiff's damages. After hearing defendants' arguments and Mr. Román's qualifications and experience in the music industry, the court found him qualified to serve as an expert in accounting, and that he possessed both the knowledge and reason to interpret the defendants' royalty reports and statements. Thus, the court denied defendants' oral motion to strike testimony. Docket No. 129. Again, at closings and in its post-trial brief, defendants reiterate their request that Mr. Román's testimony and report be stricken from the record. Docket No. 139. The brunt of defendants' objections go to the value theories the expert developed to assess plaintiffs' damages. In essence, Mr. Román's report reflects two value theories: (1) the Opportunity Cost Theory "OCT" and (2) the Conclusion of Value Theory "CVT". While admitting the expert's testimony and report, the court reserved its ruling on the expert's OCT value theory. Since the foundation for plaintiffs' case-in-chief relies on the expert's testimony, report and findings, the court will address these challenges first.

A.      The Daubert Standard

The admissibility of expert testimony is analyzed under Rule 702 of the Federal Rules of Evidence, which provides:

[i]f scientific, technical, or other specialized knowledge will assist the trier of

> fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Pursuant to Daubert v. Merrell Dow Pharms., Inc., the district court must perform a gate-keeping function to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 597 (1993); see also Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-49 (1999) (expressly extending Daubert to technical and other specialized expert testimony); Beaudette v. Louisville Ladder, Inc., 462 F.3d 22, 25 (1st Cir. 2006). "Expert testimony must be reliable, such that 'the reasoning or methodology underlying the testimony is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue.'" U.S. v. Vargas, 471 F.3d 255, 261-62 (1st Cir. 2006) (citing Daubert, 509 U.S. at 592-93). Further, the proposed expert testimony must also be relevant "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." Id. (citing Ruíz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 80 (1st Cir. 1998); Daubert, 509 U.S. at 591-92).

Proponents of the evidence, however, do not have to demonstrate that the assessments of their experts are correct, only that their opinions are reliable. Ruíz-Troche, 161 F.3d at 85 ("Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance."). Although the "focus [of the court] must be solely on principles and methodology, not on the conclusions that they generate," Daubert, 509 U.S. at 595, "conclusions and methodology are not entirely distinct from one another." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Id.

Finally, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. See Daubert, 509 U.S. at 592 n. 10

("These matters should be established by a preponderance of proof.") (citing Bourjaily v. United States, 483 U.S. 171, 175-76 (1987)); see also Fed. R. Evid. 702 Advisory Committee's Note ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

### B.      Discussion

At trial, the court heard Mr. Félix Román's qualifications and experience as a Certified Public Accountant ("C.P.A.") and his experience within the music industry. Trial Transcript ("TT"), March 23, 2009, P95-100 He has been a C.P.A. since 1995 and has been involved in the music industry for approximately fifteen (15) years. Id. His experience ranges from making record deals to handling promoters, concerts, managing composer's music catalogs and royalty payments. He was hired by DiscoHits to serve as an expert in a copyright litigation case. Id. Although he has never served as an expert in federal court, he has served as an expert in other music industry cases that were settled before going to trial. Id. As highlighted above, his experience and knowledge of the music industry was evidenced by his background within this particular field. His responses to counsel and the court's questions were clear, convincing and logical. His demeanor and composure throughout his testimony made him a credible expert witness. In light of his credentials and experience within the music industry field, the court admitted the expert's testimony and report regarding his assessments, findings, and conclusions for all areas pertaining to defendants' accounting, royalty reports and statements. Docket No. 129. Mr. Román's testimony and analysis of defendants' reports and statements as well as his observations as to defendants' reporting anomalies are worthy of credence and are admitted. Thus, the court stands by its ruling, qualifying Mr. Román as an expert in accounting in the music industry.

The court, however, reserved its ruling on admissibility of the OCT subject to further inquiry as to whether the OCT's analysis was founded on a reasonable basis. TT, March 20, 2009, P124-125, L 23. Mr. Román testified that the OCT is not an industry term, nor is it a copyright standard. Id. at P101-102. He stated that he devised the OCT to assess plaintiffs' losses and has not used the OCT before this case. Id. at 102. Further, Mr. Román testified that

the OCT has not been used in any other report concerning copyright infringement or intellectual property rights. The reference material Mr. Román used to prepare the OCT theory was a newspaper article, that stated that Mr. Curet's compositions had been hijacked due to extensive copyright litigations, and a redacted affidavit of Curet. Id. at 105-106, L. 1-21, TT, March 24, 2009, P42, L24-25, P43-50, L.17.

After careful consideration of the OCT and the Daubert standard, it is concluded that the OCT does not pass the Daubert muster for three reasons. First, the court was not satisfied with the OCT's methodology inasmuch as it lacked any link or connection to any accepted principle or theory within the music industry. Mr. Román did not reference or furnish any support that the OCT had been tested and/or was even a proven theory or accepted principle in any other industrple